**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| NATIONAL DIVERSITY COUNCIL,<br><br>            PLAINTIFF,<br><br>V.<br><br>R. DENNIS KENNEDY, JASON DEGROOT,<br>ANGELES VALENCIANO, JASON LEE, DIVERSITY<br>& LEADERSHIP, INC, AND CALIFORNIA<br>DIVERSITY COUNCIL,<br><br>            DEFENDANTS. | CASE NO. 4:23-CV-01162<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff National Diversity Council ("NDC") files this Second Amended Complaint against R. Dennis Kennedy ("Kennedy"), Jason deGroot ("deGroot"), Ángeles Valenciano ("Valenciano"), Jason Lee ("Lee"), Diversity & Leadership, Inc. ("D&L"), and California Diversity Council ("CDC") (collectively, "Defendants"). This suit stems from Defendants' years-long scheme to personally and improperly profit from NDC's donations, staffing, resources, name, platform, and trademarks. Defendants have misappropriated donor funds in numerous ways, including by unilaterally paying themselves large salaries, paying themselves as contractors, and paying non-NDC entities money that was then earmarked for the Defendants. Defendants Kennedy, deGroot, and Valenciano created an unapproved scheme to pay themselves more money in the form of "back pay," even though NDC never approved a deferred compensation program for them. Defendants Kennedy, deGroot, and Valenciano unilaterally decided that they were owed almost $3 million in "back pay," and then paid themselves more than $1 million of donor funds.

Defendants also misdirected donor funds by paying the expenses of non-NDC entities—which directly benefited Defendants.

Worse, once NDC started investigating these matters and its Board of Directors ("Board") implemented increased oversight, Kennedy, Valenciano, and deGroot conspired to protect their scheme and ill-gotten gains by attempting to destroy NDC and move its resources and partnerships to another organization where they could continue exploiting donors' funds and the organization's resources with minimal oversight. They were unsuccessful and quickly resigned—but not before writing checks for almost $200,000 just weeks before leaving.

NDC's relationship with each Defendant has been terminated, but Defendants continue to unfairly compete with NDC by infringing its trademarks, falsely associating their activities with NDC, interfering with its contracts and business relationships, and creating consumer confusion. To protect NDC, its partners, and its reputation, NDC has been left with no choice but to bring this suit to recover those misappropriated funds, obtain damages from Defendants' misuse of NDC's resources, and stop Defendants from unfairly competing with NDC by (a) using NDC's name and trademarks; and (b) tortiously interfering with its existing and prospective business relationships.

## <u>PARTIES</u>

1.      Plaintiff National Diversity Council ("NDC") is a non-profit organization located at 1301 Regents Park Drive, Suite 210, Houston, Texas 77058.

2.      Kennedy is an individual residing in Harris County, Texas.

3.      deGroot is an individual residing in Harris County, Texas.

4.      Valenciano is an individual residing in Bexar County, Texas.

5.      Lee is an individual residing in Harris County, Texas.

6.      D&L is a Texas for-profit corporation. D&L's corporate charter with the state of Texas was forfeited on March 10, 2023. Nonetheless, upon information and belief, D&L is continuing to conduct business in Texas—through Kennedy—and is doing so without the protection of the corporate veil.

7.      CDC is a Texas non-profit corporation.

<h3 align="center">JURISDICTION AND VENUE</h3>

8.      This is an action for various claims under the Lanham Act and the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §§ 1051 et seq. and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b). The Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367 since those claims form part of the same case or controversy and derive from a common nucleus of operative facts.

9.      Defendants are subject to personal jurisdiction in this district because Defendants either reside in or are doing substantial business in this district. In addition, Defendants have infringed NDC's trademarks and committed other violations of the Lanham Act, the ACPA, and/or the CFAA in this district.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the claims arose in this district and the majority of Defendants reside in Harris County.

11.      Under their agreements with NDC, deGroot, Valenciano, and Lee agreed to submit to the jurisdiction of this Court for any proceeding involving their agreements with NDC.

## FACTUAL BACKGROUND

**A.      NDC and the NDC Trademarks**

12.      NDC is a Texas nonprofit corporation formed in 2007 and recognized by the Internal Revenue Service as a charitable organization under Section 501(c)(3) of the Internal Revenue Code of 1986.

13.      NDC's mission is to be both a resource and an advocate for the value of diversity and inclusion.

14.      NDC serves as the umbrella organization to support statewide and regional affiliates, which foster an understanding of diversity and inclusion as a dynamic strategy for business success and community well-being through various initiatives.

15.      Today, NDC is the undisputed leader in championing diversity in the workplace.

16.      NDC has been actively promoting its various services since at least 2008.

17.      Over the past 15 years, NDC has created a tremendous amount of consumer recognition across the U.S. in connection with its NDC trademarks, including the NDC and NATIONAL DIVERSITY COUNCIL word marks and the design mark below (collectively, the "NDC Marks").



18.       NDC is a forerunner of community-based national organizations that champion diversity, equity, and inclusion across the country.

19. NDC is made up of state and regional councils, Global Diversity Council, Healthcare Diversity Council, Council for Latino Workplace Equity, and National Coalition for Racial Justice & Equity.

20. In 2022, NDC hosted numerous conferences/summits under the NDC Marks, including the following:

Black Men in Leadership Summit,

Women in Leadership Symposiums,

Asian American Pacific Islander Summit,

the National Latino Leadership Conference,

the National Disability Inclusion Summit,

the National Manufacturing Conference, and

the National Healthcare DEI Conference.

21. NDC also hosted college students for its Emerging Leaders Internship Program under the NDC Marks.

22. Further, NDC offers various training programs, including the Certified Diversity Professional Program (CDP) and the Executive Certification Program under the NDC Marks.

23. NDC has a 95% score with the highest four star ranking on the Charity Navigator website. Less than 0.1% of charities they rate earn a score of 95% or higher. The Charity Navigator rates organizations on how impactful they are in their given cause area, their fiscal responsibility and transparency, and follow leadership and organizational culture best practices.

24. Due to the longstanding use, extensive advertising, and widespread recognition among the consuming public, the NDC Marks are widely recognized as being associated with NDC.

25.     To support its operations, NDC has purchased domain names, developed websites, paid for website hosting, paid for email hosting, and organized its events using at least the following domain names:

| | |
|---|---|
| nationaldiversitycouncil.org | coloradodiversitycouncil.org |
| nationaldiversityconsulting.org | diversitycouncilpics.org |
| nationaldiversitycouncilregistration.org | floridadiversitycouncil.org |
| ndccertificationprogram.org | georgiadiversitycouncil.org |
| ndcawards.org | globaldiversitycouncil.org |
| ndcexecutivecertification.org | healthcarediversitycouncil.org |
| ndccertificationprogram.org | healthcarediversityconference.org |
| ndcmail.org | illinoisdiversitycouncil.org |
| ndcgraduatenetwork.org | michigandiversitycouncil.org |
| ndcindex.org | ohiodiversitycouncil.org |
| ndcnews.org | pacificnorthwestcouncil.org |
| ndcstore.org | padiversitycouncil.org |
| ndctoolkit.org | tristatediversitycouncil.org |
| ndcvirtualsuite.org | wilsymposium.com |
| ncrje.org | ywlsymposium.com |
| arizonadiversitycouncil.org | |
| blackmeninleadershipsummit.org | |
| clwe.org | |

26.     NDC is currently advertising events that will take place this year through many of these websites.

27.     Stated differently, these websites are crucial to NDC's operations; and, if taken offline, NDC's operations and cash flow will be disrupted.

**B.     Kennedy's Unlawful Activities**

28.     Kennedy was a co-founder of NDC and previously served as board chairman and an employee of NDC.

29.     Kennedy was also founder of the for-profit entity D&L and the non-profit entities CDC and Texas Diversity Council ("TDC").

30.     While there should have been proper corporate separation between these various entities, NDC has since discovered that Kennedy improperly co-mingled their expenses and resources to NDC's detriment and the financial gain of Kennedy's other organizations.

31.     As the board chairman and an executive of the organization, Kennedy used NDC funds to pay for non-NDC expenses, including Kennedy's personal expenses as well as expenses for D&L, CDC, and TDC.

32.     For example, Kennedy, along with deGroot and Lee, paid for thousands of domain names using NDC funds, even though most of those domain names were not for NDC and Kennedy, deGroot, and Lee knew these domain names would not be used for NDC.

33.     In addition, Kennedy, along with his co-defendants, used NDC resources, such as their own time and the time of NDC staff, to assist with non-NDC organizations in order to benefit Kennedy's other ventures and, ultimately, Kennedy himself.

34.     As part of a plan to benefit from NDC's platform and donations, Defendants ensured that NDC shared building space, expenses, management, and staffing with Kennedy's various non-NDC ventures, including D&L, TDC, and CDC.

35.     Kennedy failed to ensure that the organizations maintained financial separation. Instead, Kennedy used NDC funds to pay for non-NDC expenses. From approximately 2012 to 2021, Defendants balanced the finances by paying NDC back for NDC funds that were misused to pay for non-NDC expenses, such as by paying for Kennedy's other ventures, D&L, CDC, and TDC activities.

36.     But in 2021, Kennedy, along with his co-defendants, stopped reimbursing NDC for the misused funds. Instead, Defendants merely used NDC funds to pay for non-NDC expenses.

37.     Based on NDC's initial investigation, Kennedy and/or D&L and CDC owe NDC at least $350,000 in expenses that were paid for with NDC funds, but never reimbursed.

38.     While conspiring to bring down NDC and mere weeks before resigning, deGroot (likely with Kennedy and/or Valenciano's knowledge and encouragement), wrote checks to TDC (where each of deGroot, Kennedy and Valenciano are currently employed)—one for $142,632.00 and another for $57,300.00. These payments were not authorized by the NDC Board.

39.     In addition, without Board approval, Kennedy paid himself a grossly excessive salary, paid himself as a contractor, and also paid himself "back pay," even though (a) the Board never approved any deferred compensation, (b) all other Board members served (and continue to serve) in a volunteer capacity for which they receive no remuneration, and (c) Kennedy provided almost no day-to-day services for NDC following Valenciano's promotion to CEO.

40.     At a minimum, Kennedy improperly paid himself millions of dollars from NDC's donor funds.

41.     Further, Kennedy, along with at least deGroot and Valenciano, improperly declared that they were owed "back pay", even though the NDC board never approved any deferred compensation for any of the Defendants.

42.     Kennedy claimed that he was owed at least $1,440,574 in "back pay" going back to 2008. However, no such deferred compensation was ever approved, and therefore, NDC never owed Kennedy any back pay.

43.     Yet, Kennedy was paid "back pay" from donor funds, even though no such payments were owed.

44.     Kennedy was also paid $72,000 for a loan he allegedly made to NDC.

45.     NDC cannot find documentation of such a loan.

46.     On information and belief, Kennedy used the idea of a loan to justify paying himself additional donor funds.

47.     After NDC's external auditor pushed back on this loan, on or about December 26, 2023, deGroot instructed the external auditor to recharacterize the unsubstantiated loan as "back pay" even though deGroot had been given express instructions by NDC's Board on December 6, 2022 (i.e., less than three weeks earlier) to not pay out any additional purported back pay .

48.     On information and belief, Kennedy routinely used his own time and the time of NDC's staff, including Defendants deGroot and Valenciano, to work on Kennedy's other entities, including D&L, TDC, and CDC.

49.     Kennedy also had access to NDC credit cards under NDC's cardholder agreement.

50.     On information and belief, Kennedy breached his cardholder agreement by misusing his NDC credit cards for non-NDC expenses.

51.     Kennedy resigned from NDC on January 31, 2023.

52.     Today, Kennedy has no relationship or affiliation with NDC.

53.     While employed by NDC and continuing after separating from NDC, Kennedy has provided and is continuing to provide services that compete with NDC, such as diversity conferences, trainings, and awards.

54.     Although Kennedy was providing these services as a separate activity from NDC, Kennedy caused confusion as to whether these services were being provided by NDC or were associated with NDC.

55.     During an NDC board meeting on August 26, 2021, Kennedy discussed and agreed to certain distinctions between his personal, for-profit initiatives and NDC's activities.

56.    As part of that discussion, Kennedy agreed that the following trademarks and programs were NDC's, and not part of Kennedy's for-profit activities:

## NDC Programs & Initiatives

**NDC Entity: 501c3**

**Events:**
- Asian American Pacific Islander Leadership Summit
- Authentic Leadership Summit
- Black Men in Leadership Summit
- Business of Diversity & Inclusion
- Chapter Meetings (i.e., Lunch 'n Learns, Advisory Board Meetings)
- DEI Best Practice Roundtable
- Disability Inclusion Summit
- Generational Diversity Summit
- Healthcare Diversity Conference
- LGBTQ+ Unity Summit
- Latino Leadership Conference
- Veterans Summit
- Women in Leadership Symposium
- Young Women's Leadership Symposium

**Initiatives**
- Council for Latino Workplace Equity
- Global Diversity Council
- Healthcare Diversity Council
- NDC Emerging Leaders Internship Program
- National Coalition for Racial Justice and Equity

**Resources**
- Disability Inclusion Academy
- DiversityFIRST™ Certification Program
- DiversityFIRST™ ERG Academy
- DiversityFIRST™ Toolkit
- DiversityFIRST™ Virtual Suite
- NDC Consulting and Training
- NDC Index

**Awards**
- Authentic Leader Award
- Disability Ally Award
- Disability Leadership Award
- Healthcare DEI Award
- LGBTQ+ Ally Award
- LGBTQ+ Leadership Award
- National Latino Leaders Award



57.    Despite that agreement and understanding, Kennedy registered domain names and filed trademark applications under his own name for many of these names/marks, without NDC's knowledge or consent.

58.    For example, in an email in November of 2022, Kennedy demonstrated that he was intentionally hiding information from NDC's board, including the fact that he attempted to own trademark applications, trademark registrations, and domain names that belonged to NDC:

From: **Dennis Kennedy** <dennis.kennedy@denniskennedy.org>
Date: Tue, Nov 8, 2022 at 8:26 AM
Subject: NDC Rebranding
To: Angeles Valenciano <angeles.valenciano@nationaldiversitycouncil.org>

Angeles,

  Please dont mention that I own Diversity First and that is the reason for the transition of branding.  NDC has permission to use the trademark.

Thanks,

Dennis Kennedy

www.denniskennedy.org

59.    Further, although Kennedy recognized that these initiatives and marks were NDC's, he nonetheless offered and is offering conferences and other activities using these names, causing consumer confusion.

60.    In at least one recent instance, a participant of one of Kennedy's separate conferences reached out to NDC to ask whether this conference was being provided by NDC.

61.    Kennedy also solicited NDC partners for his own for-profit activities, causing NDC's partners to be confused as to whether Kennedy's activities were being provided by NDC.

62.    Kennedy was asked to "include a disclosure on [Kennedy's] websites that they are **not affiliated with or part of the NDC**."

63.    Recognizing the confusion being caused by his comingling of NDC and his other activities, Kennedy stated that he "will ask the team to make sure to add this sentence in the [email] communication [about his event], 'This event is not being hosted by the National Diversity Council.'"

64.    Further, in at least one instance, a participant of one of Kennedy's separate conferences provided NDC with a purchase order identifying NDC as the vendor, although Kennedy was providing the conference separate from NDC.

65.    In addition, Kennedy has caused and is likely to continue causing consumer confusion.

66.    As a director and co-founder, Kennedy had a fiduciary duty to NDC, including a duty of loyalty, a duty of care, and a duty of obedience.

67.    On information and belief, at some point during his relationship with NDC, Kennedy covertly began a scheme to utilize NDC's trademarks, reputation, and contacts to establish and build separate for-profit and non-profit organizations designed to compete with NDC and personally benefit Kennedy—all while being compensated by NDC.

68.    To date, Kennedy has filed about 376 trademark applications with the USPTO for various trademarks, including NDC's trademarks.

69.    In 2022 alone, before resigning from NDC, Kennedy filed approximately 350 trademark applications with the USPTO. However, Kennedy never identified NDC as the owner of any trademark application or registration.

70.    Kennedy filed all of these trademark applications with the USPTO while a director—and paid employee—of NDC.

71.    Kennedy also did not notify the NDC Board of his activities regarding these trademark applications and registrations.

72.    For example, on August 5, 2022, prior to his departure from NDC, Kennedy filed application serial no. 97537006 for NDC—the common acronym used by NDC and one of the NDC Marks.

73.     Kennedy stated in his application that this NDC mark was used for "[a]ssociation services, namely, promoting public awareness of professional, personal, and organizational development in the promotion of diversity" and that the date of first use was in 2008.

74.     From 2008 to the present, the NDC mark has been used by NDC, not by Kennedy as an individual.

75.     Then again, on December 6, 2022, while he was with NDC, Kennedy filed application serial no. 90567061 for NDC's name—NATIONAL DIVERSITY COUNCIL. That application matured into Reg. No. 6915281.

76.     Again, the NATIONAL DIVERSITY COUNCIL mark has, at all times, been used by NDC, and not by Kennedy as an individual.

77.     Kennedy never identified NDC as the owner of the NATIONAL DIVERSITY COUNCIL or NDC marks.

78.     NDC was and is still the owner of the NDC Marks.

79.     NDC is also the owner of many other trademarks that Kennedy has fraudulently sought to register with the USPTO under his own name.

80.     Under U.S. law, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. If a corporation is using a mark, then a principal officer and shareholder is not the owner.

81.     Kennedy, as a former employee and board chair of NDC, does not have any individual ownership rights of NDC's marks, including the NATIONAL DIVERSITY COUNCIL and NDC marks.

82.    Courts regularly hold that "even controlling shareholders and principal officers of a corporation do not have individual ownership rights in a mark that only the corporation used."[1] As further proof that Kennedy does not own the NDC trademarks, one need only look at the specimens Kennedy provided to the USPTO.

83.    When applying to register NDC's marks, Kennedy filed specimens with the USPTO that show NDC's website and social media posts.

84.    Kennedy's recent conduct regarding trademark registrations stands in stark contrast to normal business practices and also NDC's history with the USPTO.

85.    For example, NDC filed an application for NATIONAL DIVERSITY AWARDS in 2012, which issued as registration no. 4499642 in 2014.

86.    As is standard practice for organizations, Reg. No. 4499642 was properly assigned and owned by NDC.

87.    In 2019, while an officer for NDC, Kennedy received notice that Reg. No. 4499642 would be cancelled if NDC did not timely file a Declaration of Continued Use to maintain the mark on the Principal Register. Indeed, Kennedy received an email from the USPTO on March 18, 2019, a portion of which is copied below:

| | |
|---|---|
| From: | TMOfficialNotices@USPTO.GOV |
| Sent: | Monday, March 18, 2019 01:07 AM |
| To: | dennis_kennedy@texasdiversitycouncil.org ; dennis_kennedy@texasdiversitycouncil.or |
| Cc: | anh.vu@nationaldiversitycouncil.org |
| Subject: | Official USPTO Courtesy Reminder of Required Trademark Registration Maintenance Filing Under Section 8: U.S. Trademark RN 4499642: NATIONAL DIVERSITY AWARDS |

U.S. Serial Number: 85605039
U.S. Registration Number:  4499642
U.S. Registration Date:  Mar 18, 2014
Mark:  NATIONAL DIVERSITY AWARDS
Owner:  NATIONAL DIVERSITY COUNCIL

---

[1] *Cave Man Kitchens Inc. v. Caveman Foods LLC*, No. C18-1274 TSZ, 2020 WL 7342977, at *1 (W.D. Wash. Dec. 14, 2020).

88.    This email included the following: "WARNING:  Your trademark registration will be CANCELLED if you do not file the required document below during the specified statutory time period." *Id.* (emphasis in original).

89.    As of 2019, NDC was still using the mark NATIONAL DIVERSITY AWARDS.

90.    Although Kennedy knew that NDC was still using this mark, Kennedy allowed Reg. No. 4499642 to be cancelled for failure to file the Declaration of Continued Use.

91.    Then, in 2021, while he was still serving as an officer of NDC, Kennedy filed application serial number 90590562 for NATIONAL DIVERSITY AWARDS, which issued as Reg. No. 6458087.

92.    Kennedy did not identify NDC as the owner of the NATIONAL DIVERSITY AWARDS mark.

93.    When Kennedy filed the application for NATIONAL DIVERSITY AWARDS, Kennedy knew that NDC was still using the NATIONAL DIVERSITY AWARDS mark, including at www.ndcawards.org.

94.    The specimen that Kennedy provided to the USPTO as proof of use of the NATIONAL DIVERSITY AWARDS mark in application serial no. 90590562 shows a webpage with the following message from Kennedy:

## Founder's Welcome



Welcome to the National Diversity Awards website. Everyday hard working men and women are transforming their workplaces and communities into surroundings where individuals are valued for their talents and empowered to reach their fullest potential. The National Diversity Awards Association serves as the umbrella organization to showcase our nation's top talent. The awards are given by the National Diversity Council.

95.     Kennedy did not identify NDC as the owner of the NATIONAL DIVERSITY AWARDS mark to the USPTO, just as Kennedy did not identify NDC as the owner of the NDC or NATIONAL DIVERSITY COUNCIL marks.

96.     In his application for the NATIONAL DIVERSITY AWARDS mark, Kennedy stated that the date of first use was in 2012.[2]  Any use in 2012 of NATIONAL DIVERSITY AWARDS would have been use by NDC, and not Kennedy as an individual.

97.     In violation of 15 U.S.C. § 1120, Kennedy has fraudulently registered at least the following trademarks:

| Mark | Reg. No. |
|---|---|
| NATIONAL DIVERSITY COUNCIL | 6915281 |
| NATIONAL DIVERSITY COUNCIL AN INCLUSIVE COMMUNITY A BETTER NATION | 6933084 |
| NATIONAL DIVERSITY AWARDS | 6458087 |

98.     Kenney knew that NDC was the true and proper owner of the NDC Marks.

99.     Kennedy also fraudulently alleged use by NDC to obtain these registrations, including providing specimens to the USPTO showing NDC's use of these marks.

100.    On Sunday, March 26, 2023, Kennedy's lawyer sent NDC a DEMAND TO CEASE AND DESIST letter, demanding that NDC stop using its own name and trademarks[3]

101.    The letter stated that "as of Sunday, March 26, 2023, the NDC's license to use the NDC trademark has been revoked by the trademark owner, R. Dennis Kennedy." *Id.*

---

[2] *See* Exhibit C to Plaintiff's First Amended Complaint (ECF No. 10).
[3] *See* Exhibit D to Plaintiff's First Amended Complaint (ECF No. 10).

102.    Kennedy also stated that "the NDC's licenses [sic] to use the below domains are also revoked," which includes NDC's domain name at nationaldiversitycouncil.org. *Id.*

103.    Kennedy, as a former board chair and employee, is now demanding that NDC stop using its own name and website. *Id.*

104.    Kennedy is not the owner of the NDC Marks.

105.    Kennedy and NDC never entered into any license agreement for the NDC Marks because NDC, as the corporate entity using the marks is the proper owner of those marks.

106.    This letter is the first time that Kennedy ever attempted to notify NDC that he, as an individual, owned any of NDC's trademarks.

107.    This letter is also the first time that Kennedy mentioned the idea that NDC was using the NDC Marks under a license from Kennedy.

108.    There is no written or oral license agreement between Kennedy and NDC for any trademarks, let alone the NDC Marks.

109.    At all times, NDC has been and continues to be the true and proper owner of the NDC Marks.

110.    NDC has used the NATIONAL DIVERSITY AWARDS mark in the past, and is presently using the NATIONAL DIVERSITY COUNCIL AWARDS mark on its website at ndcawards.org.

111.    Despite knowing that it would be confusing, Kennedy created a nearly identical website at diversityawards.com using the following graphic:



112.   Not only is Kennedy infringing on NDC's trademarks, but Kennedy is also creating a false impression that he and his organizations are still associated with NDC.

113.   For example, although Kennedy is no longer affiliated with NDC, Kennedy is telling the public the following on his diversityawards.org website:



114.   NDC does provide the National Diversity Council Awards. However, Kennedy is no longer affiliated with or associated with NDC.

115.    Further, Kennedy does not have a license or permission to use any of NDC's trademarks.

116.    Kennedy also does not have permission to present himself as being affiliated or associated with NDC. Consequently, Kennedy is not entitled to use any of the NDC Marks to promote his other endeavors, nor is he entitled to create the misleading impression that he is still associated or affiliated with NDC.

117.    Kennedy is also now directly competing with NDC for conference participants and sponsors; and, upon information and belief, is using information and materials that he misappropriated from NDC to do so.

**C.    deGroot's Unlawful Activities**

118.    deGroot was the Chief Financial Offer ("CFO") of NDC until his abrupt resignation on February 1, 2023.

119.    As an officer, deGroot had a fiduciary duty to NDC, including a duty of loyalty and utmost good faith, a duty of candor, a duty to refrain from self-dealing, a duty to act with integrity of the strictest kind, a duty of fair and honest dealing, and a duty of full disclosure.

120.    Further, deGroot signed NDC's non-disclosure and credit card cardholder agreements.

121.    While there should have been proper corporate separation between NDC, D&L, TDC, and CDC, deGroot improperly co-mingled their expenses and resources.

122.    For example, deGroot used NDC funds to pay for non-NDC expenses, including Kennedy's personal expenses as well as expenses for D&L, CDC, and TDC.

123.    While conspiring to bring down NDC and mere weeks before resigning, deGroot (likely with Defendants Kennedy's and Valenciano's knowledge and encouragement), wrote checks to TDC (where each of deGroot, Kennedy and Valenciano are currently employed)—one for $142,632.00 and another for $57,300.00. These payments were not authorized by the NDC Board.

124.    As another example, deGroot, along with at least Kennedy and Lee, were paying for thousands of domain names using NDC funds, even though most of those domain names were not for NDC.

125.    deGroot also had access to NDC credit cards under NDC's cardholder agreement.

126.    On information and belief, deGroot breached his cardholder agreement by misusing his NDC credit cards for non-NDC expenses.

127.    In addition, deGroot, along with his co-defendants, was using NDC resources, such as staff, to assist with non-NDC events.

128.    For example, on information and belief, deGroot regularly provided services to D&L, TDC, and CDC even though his time was being paid for by NDC. Further, on information and belief, deGroot never compensated NDC for the time he and NDC staff spent on non-NDC activities.

129.    As part of a plan to benefit from NDC's platform and donations, Defendants ensured that NDC shared building space, expenses, management, and staffing with Kennedy's various non-NDC ventures, including D&L, TDC, and CDC.

130.    deGroot failed to ensure that the organizations maintained financial separation. Instead, deGroot used NDC funds to pay for non-NDC expenses. From 2012 to 2021, Defendants would balance the finances by paying NDC back for NDC funds that were misused to pay for non-NDC expenses, such as by paying for D&L, CDC, and TDC expenses.

131.    But in 2021, deGroot, along with his co-defendants, stopped paying NDC back for the misused funds. Instead, Defendants merely used NDC funds to pay for non-NDC expenses.

132.    Based on an initial investigation, Defendants owe NDC at least $350,000 for expenses that were paid for with NDC funds, but never reimbursed.

133.    In addition, without Board approval, deGroot paid himself an excessive salary, paid himself as a contractor, paid himself "back pay" (even though the Board never approved any deferred compensation), and paid other organizations such as TDC money that was then earmarked for him.

134.    At a minimum, deGroot improperly paid himself over a million dollars from NDC's donor funds.

135.    Further, deGroot, along with at least Kennedy and Valenciano, improperly declared that they were owed "back pay," even though the NDC board never approved any deferred compensation for any of the Defendants.

136.    deGroot claimed that he was owed at least $817,900 in "back pay" going back to 2008. However, no such deferred compensation was ever approved, and therefore, NDC never owed deGroot any back pay.

137.    Yet, deGroot was paid "back pay" from donor funds, even though no such payments were owed.

138.    Further, although he owed a fiduciary duty to NDC, deGroot assisted Kennedy in funneling NDC's donor funds to Kennedy. For example, when NDC's external auditor pushed back on paying Kennedy for the alleged $72,000 loan he made to NDC, on or about December 26, 2023, deGroot instructed the external auditor to recharacterize the unsubstantiated loan as "back pay" even though deGroot had been given express instructions by NDC's Board on December 6, 2022 (i.e., less than three weeks earlier) to not pay out any additional purported back pay.

139.    On information and belief, deGroot issued payment from NDC to Kennedy in the amount of $72,000 even though there was no loan documentation or "back pay" justification.

140.    In addition, deGroot misused and continues to misuse NDC's confidential materials, in violation of the non-disclosure agreement signed with NDC.

141.    Further, deGroot improperly used NDC's credit card in violation of the credit card agreement with NDC.

142.    deGroot also approved NDC funds to pay for non-NDC expenses, such as thousands of domain names purchased for non-NDC activities by Defendants, including Kennedy and Lee.

**D.    Valenciano's Unlawful Activities**

143.    Valenciano was the Chief Executive Officer ("CEO") of NDC until her abrupt resignation on February 1, 2023.

144.    As an officer, Valenciano had a fiduciary duty to NDC, including a duty of loyalty and utmost good faith, a duty of candor, a duty to refrain from self-dealing, a duty to act with integrity of the strictest kind, a duty of fair and honest dealing, and a duty of full disclosure.

145.    Further, Valenciano signed NDC's non-disclosure and credit card cardholder agreements.

146.    While there should have been proper corporate separation between NDC, D&L, TDC, and CDC, Valenciano improperly co-mingled their expenses and resources.

147.    While conspiring to bring down NDC and mere weeks before resigning, upon information and belief, Valenciano caused or encouraged deGroot to write checks to TDC (where each of deGroot, Kennedy and Valenciano are currently employed)—one for $142,632.00 and another for $57,300.00. These payments were not authorized by the NDC Board.

148.    As another example, Valenciano used NDC funds to pay for non-NDC expenses, including Kennedy's personal expenses as well as expenses for D&L, CDC, and TDC.

149.    As a further example, on information and belief, Valenciano, along with at least Kennedy and Lee, were paying for thousands of domain names using NDC funds, even though most of those domain names were not for NDC.

150.    Valenciano also had access to NDC credit cards under NDC's cardholder agreement.

151.    On information and belief, Valenciano breached her cardholder agreement by misusing her NDC credit cards for non-NDC expenses.

152.    In addition, Valenciano, along with her co-defendants, was using NDC resources, such as staff, to assist with non-NDC events.

153.    As part of a plan to benefit from NDC's platform and donations, Defendants ensured that NDC shared building space, expenses, management, and staffing with Kennedy's various non-NDC ventures, including D&L, TDC, and CDC.

154.    Valenciano failed to ensure that the organizations maintained financial separation. Instead, Valenciano used NDC funds to pay for non-NDC expenses. From approximately 2012 to 2021, Defendants would balance the finances by paying NDC back for NDC funds that were misused to pay for non-NDC expenses, such as by paying for D&L, CDC, and TDC expenses.

155.    But in 2021, Valenciano, along with her co-defendants, stopped paying NDC back for the misused funds. Instead, Defendants merely used NDC funds to pay for non-NDC expenses.

156.    Based on an initial investigation, Defendants owe NDC at least $350,000 for expenses that were paid for with NDC funds, but never reimbursed.

157.    In addition, without Board approval, paid herself as a contractor, paid herself "back pay" (even though the Board never approved any deferred compensation), and paid other organizations such as TDC money that was then earmarked for her.

158.    Valenciano claimed that she was owed at least $713,860 in "back pay" going back to 2011. However, no such deferred compensation was ever approved, and therefore, NDC never owed Valenciano any back pay.

159.    Yet, Valenciano was paid "back pay" from donor funds, even though no such payments were owed.

160.    In addition, Valenciano misused and continues to misuse NDC's confidential materials, in violation of the non-disclosure agreement she signed with NDC.

161.    Further, Valenciano improperly used NDC's credit card in violation of the credit card agreement with NDC.

162.    Valenciano also approved and/or facilitated NDC funds to pay for non-NDC expenses, such as thousands of domain names purchased for non-NDC activities by Defendants, including Kennedy and Lee.

E.     **Lee's Unlawful Activities**

163.    Lee is an independent contractor hired by NDC to assist with information technology issues.

164.    In particular, Lee was engaged to handle domain name registrations and manage NDC's websites.

165.    On his bio on the TDC's website, Lee identifies himself as "a front end developer for the National Diversity Council (NDC)," and "is responsible for the upkeep of all websites under the NDC umbrella as well as the creation of new websites and designs designs [and] [h]e also helps administer the server, Google Workspace[.]"

166.    Although he was engaged by NDC, to manage NDC's websites, designs and server for the benefit of NDC, Lee registered domain names under accounts controlled by Kennedy.

167.    Lee signed NDC's credit card cardholder agreement, which specified that NDC's credit card was limited to use for NDC expenses.

168.    Lee used NDC's credit card—which he was entrusted with on the condition that it could only be used for authorized business purposes on behalf of NDC—to charge domain name registration and renewal fees to NDC.

169.    However, Lee registered and renewed thousands of domain names for Kenney and others using NDC's credit card.

170.    On information and belief, Lee breached his cardholder agreement by misusing his NDC credit cards for other non-NDC expenses as well.

171.    Although NDC paid Lee and paid GoDaddy for domain names using NDCs Marks, Lee allowed or transferred control of those domain names to Kennedy.

172.    On information and belief, Lee used NDC's credit card for other non-NDC expenses as well.

173.    On January 22, 2023, NDC instructed Lee to immediately suspend Kennedy's access to NDC's systems, including Kennedy's access to NDC's Google Workspace and email.[4]

174.    Roughly 30 minutes after confirming that Kennedy's access had been successfully suspended, Lee temporarily restored Kennedy's access to NDC's systems and allowed Kennedy to download NDC's confidential materials and documents. Lee did not obtain NDC's permission to restore access to Kennedy nor did he advise NDC that he was restoring Kennedy's access.

175.    Following Kennedy's restored—and unauthorized—access, within less than 24 hours, Kennedy accessed, shared, or downloaded approximately 9,492 files on NDC's Google Workspace. This is corroborated by Google user logs that document Kennedy's user activity and are associated with an IP address (76.143.121.65) that, upon information and belief, is tied to a device that is owned or operated by Kennedy.

176.    Moreover, at the time that Kennedy accessed many of these files, he *knew* that his access was prohibited and unauthorized by NDC. Specifically, on January 23, 2023, at 8:32 a.m., Kennedy was given express instructions to not access NDC's Google Workspace:

> While on leave, effective immediately:
>
> (1) your access credentials to your NDC email account, computer, and electronic workspaces are being suspended and under no circumstances should you access, modify, alter, delete, or destroy any material on your NDC email account, computer, or electronic workspaces;

---

[4] *See* Exhibit E to Plaintiff's First Amended Complaint (ECF No. 10).

177.    Further, on information and belief, after Lee was instructed to terminate Kennedy's access to NDC's systems, Lee (a) provided Kennedy with access to important NDC Google shared drive folders by adding a new email account for Kennedy, namely dennis.kennedy_denniskennedy.org@nationaldiversitycouncil.org; and (b) downloaded over 1,000 files from the NDC Google shared drive through a separate IP address that, upon information and belief is associated with a device that is owned or operated by Lee, which Lee then provided to Kennedy.

178.    Worse, text messages exchanged between Lee and Kennedy reveal that as of January 25, 2023, Lee was covertly working with Kennedy to transfer all of Kennedy's emails on NDC's Google Workspace—including Kennedy's NDC emails—to a separate Gmail account:



179.    On January 26, 2023, NDC suspended Lee's services and instructed Lee not to access NDC's email accounts or systems and to not share any nonpublic information acquired from NDC with Kennedy (consistent with Lee's contractual obligations to NDC). Further, Lee was instructed not to take any actions regarding NDC's systems (including websites and domain names) without NDC's instructions. *Id.*

180.    Despite those instructions, on information and belief, while acting in concert with Kennedy, Lee has accessed NDC's accounts and systems, and has also changed NDC's domain name information.

181.    Defendants, either individually or acting in concert, control many of NDC's domain names because—as was the case with NDC's Marks, Defendants improperly registered them in an account that is separate from NDC's GoDaddy account, notwithstanding the fact that Defendants registered them on behalf of NDC, at the direction of NDC, using NDC's funds, while employed by NDC.

182.    NDC's Domain Names, along with thousands of other domain names, were paid for using NDC's funds.

183.    All domain names paid for with NDC funds are the property of NDC.

184.    Defendants have improperly taken possession of NDC's property, namely domain names.

## F.    D&L's Unlawful Activities

185.    D&L is a Texas for-profit entity formed and controlled by Kennedy.

186.    D&L owes NDC at least $185,775.63 based on NDC's payments of various expenses on behalf of D&L. D&L had promised to reimburse NDC for these expenses, but has not done so.

187.    D&L directly competes with NDC by providing similar services, namely seminars, training, conferences, and awards.

188.    Kennedy, by way of his position with NDC, was actively using NDC's name, trademarks, platform, contacts, staff, and other resources to divert revenue from NDC to D&L.

189.    For example, D&L has and continues to advertise services, such as conferences and awards, while explicitly or implicitly referencing NDC.

190.　　Kennedy, by way of his position as founder and prior board chair of NDC, would solicit NDC's partners for D&L's services—without notifying the recipients that these services were not affiliated with NDC.

191.　　D&L has no relationship with NDC.

192.　　Kennedy and D&L have and continue to confuse consumers by falsely implying and insinuating that services provided by D&L, such as seminars, conferences, trainings, and awards, are somehow sponsored by or affiliated with NDC.

193.　　On multiple occasions, consumers have been actually confused into believing that D&L's services are being provided by, sponsored by, or are affiliated with NDC.

194.　　D&L is also confusing consumers by utilizing NDC's Marks, as well as confusingly similar trademarks.

195.　　D&L is also misusing NDC's confidential information by utilizing NDC's customer resource management system and data, such as what is maintained in Salesforce.

196.　　Further, D&L has copied many of the training and other materials that NDC developed for its own trainings and services.

## G.  CDC's Unlawful Activities

197.　　CDC is a Texas non-profit entity formed and controlled by Kennedy.

198.　　CDC owes NDC at least $74,341.68 based on NDC's payments of various expenses on behalf of CDC. CDC had promised to reimburse NDC for these expenses, but has not done so.

199.　　CDC directly competes with NDC by providing similar services, namely seminars, training, conferences, and awards.

200.　　Kennedy, by way of his position with NDC, was actively using NDC's name, trademarks, platform, contacts, staff, and other resources to divert revenue from NDC to CDC.

---

201.    For example, CDC has and continues to advertise services, such as conferences and awards, while explicitly or implicitly referencing NDC.

202.    Kennedy, by way of his position as founder and prior board chair of NDC, would solicit NDC's partners for CDC's services—without notifying the recipients that these services were not affiliated with NDC.

203.    CDC has no relationship with NDC.

204.    Kennedy and CDC have and continue to confuse consumers by falsely implying and insinuating that services provided by CDC, such as seminars, conferences, trainings, consulting, and awards, are somehow sponsored by or affiliated with NDC.

205.    For example, CDC is using a design mark that is confusingly similar to NDC's design mark, as shown below:



206.    Further,    as    shown    on    CDC's    webpage    at http://californiadiversitycouncil.org/welcome/, Defendants Kennedy and Valenciano explicitly trade-off the NDC name and organization while describing CDC, falsely implying an association with NDC.

> The Council strives to be a resource for both individuals and organizations in California. Therefore, we would like to invite you to participate in the Council's initiatives and help us create a positive and lasting impact, lasting impact in California communities.
>
> Regards,
>
> Dennis Kennedy                          Angeles Valenciano
> *Founder & Chairman*                      *CEO*
> *National Diversity Council*              *National Diversity Council*

207. CDC is also advertising that one of its services is "NDC Consulting," as shown on

the webpage at http://californiadiversitycouncil.org/services/

## NDC Consulting

NDC Consulting, a division under the National Diversity Council, is
committed to help organizations achieve success in today's global market.
We offer strategic consulting in three major areas and provide results
tailored to individual client needs. Our recognized consultants have vast
knowledge and experience in the D&I field.

Let us help your organization achieve success. Contact for Dennis
Kennedy for more information at
dennis.kennedy@nationaldiversitycouncil.org.

208. Not only is CDC using NDC's Mark, but also it is falsely promoting CDC's

consulting services as if such services are being provided by NDC.

209. Defendants have no affiliation with NDC.

210. On multiple occasions, consumers have been actually confused into believing that

CDC's services are being provided by, sponsored by, or are affiliated with NDC.

211. CDC is also confusing consumers by utilizing NDC's Marks, as well as confusingly

similar trademarks.

212. CDC is also misusing NDC's confidential information by utilizing NDC's customer

resource management system and data, such as what is maintained in Salesforce.

213. Further, CDC has copied many of the training and other materials that NDC

developed for its own trainings and services.

**H.    Kennedy's, deGroot's, and Valenciano's Concerted Attempt to Destroy NDC**

214.    Defendants Kennedy, deGroot, and Valenciano unilaterally claimed that they were owed at least $2,972,334 in "back pay" going back to 2008.

215.    Defendants Kennedy, deGroot, and Valenciano then began to pay themselves this alleged "back pay," and in fact, paid themselves at least $1,115,500 in "back pay."

216.    Because the NDC Board never approved any of this "back pay," each payment for "back pay" was improper.

217.    On March 10, 2022, Kennedy, deGroot and Valenciano sent a letter to two members of NDC's Board, claiming that they were collectively still owed approximately $1,856,834 in back pay for the time period of 2011–2018.

218.    As part of this request for "back pay," Kennedy, deGroot and Valenciano suggested a three-year repayment plan that could be extended:

Our recommendation is to pay these amounts back over the next three years from 2022-2024. This period is consistent with the repayment amounts that occurred during 2021. These repayment terms can be extended if the NDC financial situation changes due to unforeseen circumstances or if the executive leaves the organization. If the executive does leave the NDC, the compensation is still owed since it has already been earned in prior years, and would be repaid following the 2022-2024 timeline. There will be no interest incurred for the compensation that is owed. The annual repayment amount will be submitted in the annual budget each year.

219.    On information and belief, Defendants Kennedy, deGroot and Valenciano knew that this "back pay" was not properly approved by the NDC Board. For example, deGroot as NDC's CFO, did not record this liability in NDC's books.

220.    On information and belief, there is no documentation or NDC Board decision approving this alleged "back pay."

221.    In response to Defendants' request for almost $2 million in "back pay," NDC Board Member Rodney Morris ("Morris") advised Kennedy, deGroot, and Valenciano that their request would be presented to NDC's finance committee for further review.

222.    Without NDC's Board's knowledge or approval, Defendants Kennedy, deGroot, and Valenciano began paying themselves this purported "back pay."

223.    In total, without the Board's knowledge or approval, Kennedy, deGroot, and Valenciano improperly paid themselves an additional $1,033,0250 in 2022—in addition to their regular salaries.

224.    Upon discovering these unilateral payouts, on December 6, 2022, Morris instructed Kennedy, deGroot, and Valenciano to immediately cease and desist any additional payments pending further investigation of this matter.

225.    These instructions were later followed by a Board meeting that deGroot and Valenciano attended on December 21, 2022 to discuss adjusted compensation and further investigation of the purported back pay owed. During this period, NDC's Board made multiple attempts to contact Kennedy to discuss these same issues. Kennedy refused all efforts by NDC's Board to engage in dialogue regarding compensation and back pay.

226.    This was followed by an email that Morris sent to Valenciano and deGroot on December 27, 2023, requesting that deGroot and Valenciano return the excess payments that they unilaterally paid themselves in 2022 pending an outside audit:

1.  Board Approved Actions Relating to Executive Back Pay
    *   The Board has approved to engage a forensic accountant to help us understand how Executive Compensation has been handled and accounted for in the past.  We anticipate this project to kick off in early January and are appreciative of your willingness to assist us in this project.
    *   The remaining unpaid back pay will not be made until a determination of reasonableness is made.
    *   Until the Board completes the forensic accounting project to understand if the back pay amount is reasonable for services rendered, the Board is requesting any back pay funds to be repaid until that determination is made.  If you are unable to repay this amount, we will look to you for a plan, and the Board will need to meet again for review/approval.  If the determination is made services rendered were reasonable, the Board would then authorize repayment of those funds.

227.    Unbeknownst to NDC at the time, this email prompted Kennedy, deGroot, and Valenciano to conspire about ways to destroy NDC and/or remove its Board members who were seeking to exercise proper and necessary oversight over Defendants' recent misconduct (*i.e.*, self-dealing).

228.    On December 28, 2022, deGroot sent an email to NDC's accountant stating that Defendants Kennedy, deGroot, and Valenciano "don't plan on paying back any of the back pay that we have received."

229.    While deGroot was candid with NDC's accountant about their refusal to return any of the excess payments that they had unilaterally paid themselves in 2022, he declined to respond to Morris.

230.    Email records make clear that deGroot's silence with the Board was intentional. On December 30, 2022, Kennedy—*i.e.*, the Board Chairman who had fiduciary duties to NDC— instructed deGroot and Valenciano (the CFO and CEO) to not communicate with the Board:



231.    Stated differently, the Board Chairman—who had fiduciary duties to NDC—sought to prohibit NDC's Board from communicating with its own CEO and CFO.

232.    That same day (December 30, 2022), deGroot circulated a list of NDC's 2023 partnership renewal information to Kennedy and Valenciano:



233.    Upon information and belief, this list was circulated amongst Kennedy, deGroot, and Valenciano for the purpose of exploring ways to eliminate NDC's current Board.

234.    This belief is further substantiated by an email exchange between Kennedy, deGroot, and Valenciano on December 31, 2022, wherein they conspired to freeze all 2023 partnership renewals:



235.   Any deliberate attempt to suspend NDC's partnership renewals would be detrimental for two reasons: (a) it would potentially force Board Members to roll off because their board positions are contingent upon their affiliate organizations having a partnership with NDC, leaving NDC without a governing board; and (b) it would cut off a key revenue stream for NDC, which would impact cash flow and the organization's ability to operate.

236.   Two days later, Kennedy, deGroot and Valenciano scheduled a "Follow Up Conversation" for 10:00 a.m. on January 2, 2023. Upon information and belief, this meeting took place as planned and revisited the three executives' options for eliminating NDC's Board.

237.   This is corroborated by an email that Valenciano sent to deGroot approximately 49 minutes later (10:49 a.m.) providing a copy of the contact information for NDC's Board (whom Kennedy had instructed deGroot and Valenciano to not contact).



238.   Later, that same day (January 2), Valenciano began contacting various key managerial personnel of NDC to schedule one-on-one calls for January 3, 2023. When coordinating these calls, Valenciano stressed that confidentiality was essential, as evidenced in the following exchange:



239.    On January 3, 2023, Valenciano and deGroot conducted one-on-one calls with four key managerial employees of NDC. During these private (and abruptly scheduled) meetings, Valenciano and deGroot (a) instructed each employee to not discuss the meeting with anyone else or put anything in writing; (b) represented that the Board had turned on them and was now refusing to pay backpay owed; and (c) advised that NDC was implementing a hiring/travel freeze and suspending all in-person events, effective at the beginning of the second quarter of the fiscal year.

240.    According to NDC's email records, Kennedy, deGroot and Valenciano scheduled an additional "Follow up" meeting for 8:30 a.m. on January 5, 2023. Upon information and belief, this meeting took place as planned and again focused on exploring ways that these three executives could eliminate NDC's Board.

241.    At approximately 4:16 p.m. that same day, deGroot sent an email to Kennedy and Valenciano, providing his analysis of how they could potentially remove NDC's board members:



242.    On January 9, 2023, Valenciano further interfered with NDC's business and contracts. For example, Valenciano sent an enterprise-wide email announcing that NDC would be suspending all hiring, travel, and in-person events, beginning Q2. This decision was not discussed with nor approved by the NDC Board. On information and belief, Valenciano's decision was part of Defendants' scheme to freeze/dimmish incoming funds for NDC and divert NDC's events and donations to non-NDC entities, such as TDC, CDC, and D&L.

243.    Following this directive, NDC's staff began cancelling various in-person events that were scheduled for later in the year notwithstanding that (a) they had made significant investments in these upcoming events (many of which are planned a year out); and (b) they were under contract with some venues and would incur cancellation fees and forfeit non-refundable deposits.

244.    While Defendants Kennedy, deGroot, and Valenciano changed all of NDC's upcoming in-person events to virtual events (which typically have much stronger participation and donations than virtual events), upon information and belief, they did not shut down the in-person events for their other organizations, such as D&L, TDC, and CDC.

245.    Terminating NDC's upcoming in-person events was part of Defendants' plan to intentionally harm NDC and divert participants and donations to other non-NDC organizations, such as TDC.

246.    During this same period of time, Kennedy repeatedly ignored the Board's attempts to engage in dialogue about his compensation and purported back pay. For example, Morris made approximately 5 attempts to contact Kennedy to discuss these issues—each of which was ignored by Kennedy.

247.    Consequently, on January 13, 2023, the Board sent Kennedy a letter advising that effective January 31, 2023, it would be eliminating the salaried W-2 Board Chairman position and converting this role to an unpaid volunteer role, consistent with all other NDC board positions— all of which are unpaid. Nevertheless, in appreciation of Kennedy's contributions to NDC and previous experience as the Board Chairman, NDC offered Kennedy the opportunity to serve as the inaugural volunteer Board Chairman.

248.    Kennedy never responded to this offer. Instead, that day, Kennedy doubled-down on his efforts to internally stop NDC from sending out partnership renewals:



249.    Following Kennedy's receipt of the January 13, 2023 letter from the Board, Valenciano began falsely telling employees of NDC that Kennedy had been terminated.

250. Upon information and belief, Kennedy, deGroot, and Valenciano also began conspiring about ways to move NDC's assets to another organization. For example, on January 13, 2023 Valenciano asked an NDC employee in confidence to begin secretly downloading all of NDC's documents from Google Workspace for use with another organization (*e.g.*, D&L, TDC).

251. Recognizing this request was clearly not in the best interest of NDC, on January 14, 2023, this employee advised Valenciano that she was not going to complete the request asked of her:

From: **Angeles Valenciano** <angeles.valenciano@nationaldiversitycouncil.org>
Date: Sat, Jan 14, 2023 at 9:19 AM
Subject: Re: Update
To: [redacted]

Good morning, thank you for the note per our conversation with more/new directives from our legal team, there is no need to move forward.

Have a good weekend!

A-

On Sat, Jan 14, 2023 at 7:58 AM [redacted] wrote:

> Good morning, Angeles,
>
> Apologies for the email on the weekend. I want to let you know that I am not going to complete the request made of me yesterday, as I do not feel comfortable doing so.
>
> Thank you,

252. On January 17, 2023, Kennedy sent an email to Valenciano and deGroot expressing interest in suing NDC and freezing all operations:



253.    deGroot and Valenciano—officers of NDC—had a fiduciary obligation to protect NDC and inform the Board of Kennedy's plans.

254.    Instead, Valenciano and deGroot conducted an executive leadership meeting on January 18, 2023 with other key leadership personnel of NDC (two of whom were also employed by TDC). Valenciano prefaced this meeting by reminding the employees of their confidentiality obligations and emphasized that no one was to record this meeting.

255.    Valenciano and deGroot told these individuals the following falsehoods, namely (a) Kennedy had been "fired/terminated;" (b) that Kennedy owned the NDC brand and could shut it down; and (c) the Board is destroying NDC.

256.    Valenciano and deGroot told these individuals that they could no longer communicate with the Board and that they were to immediately stop invoicing NDC's partners in order to force Board members to roll off.

257.    Valenciano and deGroot also told these individuals that they needed to start preparing for contingencies, which they framed as a "Plan A" and a "Plan B." "Plan A" would entail suing the Board. "Plan B" (their preferred choice) would entail moving NDC's partners and assets to another organization.

258.    Following this meeting, Valenciano and deGroot continued their efforts to implement their stated plan. For example, Valenciano confided to an NDC employee that she would be traveling to Houston to freeze NDC's assets and that Kennedy was going to shut down the organization. Similarly, deGroot instructed an employee to cease all efforts to roll out NDC's new website and to instead start repurposing it for use within another organization.

259.    On January 21, 2023, multiple employees contacted Morris to express concern about the January 18, 2023 meeting, and Valenciano's and deGroot's efforts to destroy NDC—all of which was then unknown to NDC's Board.

260.    On January 22, 2023, NDC's Board conducted a closed emergency meeting to address these newly raised complaints. During this emergency meeting, the Board elected to suspend Kennedy, deGroot and Valenciano—with pay—pending an outside investigation.

261.    Kennedy, deGroot and Valenciano were notified of their immediate suspensions, with pay, pending an outside investigation, the morning of January 23, 2023. In connection with this outside investigation, Kennedy, deGroot and Valenciano were also asked to make themselves available to be interviewed.

262.    After Valenciano received notice of her suspension from NDC, terminated one of the individuals who reported the January 18, 2023 meeting to NDC's Board.

263.    That same day (January 23), Thompson & Horton, LLP advised NDC that it had been retained to represent Valenciano and deGroot in connection with claims related to their employment at NDC.

264.    In this same letter, Thompson & Horton, LLP further demanded that NDC collectively pay Valenciano and deGroot $422,760 within two weeks and further threatened: "If we do not receive the entire unpaid balance by Friday, February 3, 2023, we will consider this a breach of the agreement between NDC and Ms. Valenciano and Mr. deGroot and will immediately pursue legal remedies to recover the full amounts due and owing, including attorney's fees."

265.    On January 24, 2023, NDC promptly responded to Valenciano's and deGroot's demand and stated in part:

> The wage issues referenced in your letter are not the subject of the pending outside investigation that is referenced in Mr. Morris' letter nor did these issues play any role in the Board's decision to suspend your clients pending this investigation. While I am glad to continue dialogue on these separate wage issues, I would appreciate you providing additional details about the "agreement [that] was made between NDC and [your] clients."
>
> More pressing (and concerning), your letter ignores my client's request for Ms. Valenciano and Mr. deGroot to make themselves available to be interviewed. To be clear, the stated deadlines in Mr. Morris' letter stand and my client expects your clients—who remain paid employees of NDC—to fully and timely cooperate. Again, refusal to cooperate with this investigation or NDC's instructions may result in your clients' termination.

266.    On January 26, 2023, Thompson & Horton, LLP advised that "Ms. Valenciano and Mr. deGroot are available to participate in a virtual interview on February 1, 2023." Interviews were ultimately scheduled to commence at 9:00 a.m. on February 1, 2023.

267.    That same week, Valenciano and deGroot's counsel sent additional correspondence to NDC that sought to prohibit NDC from having *any* communications with TDC and insisted that all communications intended for TDC should be directed to Valenciano and deGroot (even though they were the subject of an outside investigation):

> Demand is hereby made to the NDC to immediately:

. . .

> (4) cease and desist all further efforts to directly or indirectly contact any employees, board members, contractors, or agents of TDC to discuss any matter related to TDC. All communications regarding or relating to TDC are to be directed to Ms. Valenciano and Mr. deGroot.

268.    Importantly, Valenciano and deGroot's counsel has acknowledged that they did not represent TDC at the time they sent this letter. Stated differently, Valenciano and deGroot, through their personal counsel, sought to abruptly prohibit NDC from having any interaction with TDC notwithstanding these organizations' longstanding—and valued—partnership, which dates back to 2008.

269.    Unbeknownst to NDC at the time, this was the first of many steps that Kennedy, deGroot, and Valenciano have taken to directly interfere with NDC and TDC's partnership.

270.    Upon information and belief, Kennedy, deGroot, and Valenciano have (a) deliberately withheld and/or misrepresented material facts from TDC and its board, including material facts related to NDC's Board, their purported back pay, their suspensions from NDC, and their concerted efforts to eliminate NDC's Board; (b) sought to keep the findings from NDC's outside investigation from being shared with TDC's board; and (c) taken various actions—without the input or approval of TDC's board—to divorce TDC from NDC.

271.    For example, TDC has (a) rebranded its logo and abandoned the use of any marks suggesting an affiliation with NDC; (b) sought to eliminate any affiliation with NDC on its website; and (c) started to exclude NDC from various national events that were originally planned to be shared events, including but not limited to the Veterans Summit and the 2024 Women in Leadership Conference.

272.    While Valenciano and deGroot were scheduled to be interviewed on February 1, 2023 in connection with NDC's outside investigation, their position abruptly changed the day before they were scheduled to be interviewed.

273.    The afternoon of January 31, 2023 (the same day that Kennedy resigned from NDC), Valenciano and deGroot's attorneys advised that Valenciano and deGroot would no longer be making themselves available for interview and would instead resign, effective February 1, 2023.

274.    On February 1, 2023, Valenciano and deGroot tendered their notice of resignation to NDC, effective immediately.

275.    But while conspiring to destroy NDC, and unbeknownst to the NDC Board, deGroot (likely with Kennedy and Valenciano's knowledge or encouragement) wrote two checks to TDC in January—one for $142,632 and another for $57,300. These payments were not approved by NDC's Board. On information and belief, these payments to TDC were earmarked for Defendants Kennedy, deGroot, and/or Valenciano as part of their scheme to continue improperly paying themselves funds from NDC's donor funds.

## CLAIMS FOR RELIEF

### COUNT I:
### Cancellation of Kennedy's Registrations of NDC's Marks
### Under the Lanham Act, 15 U.S.C. § 1119

276.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

277.    Kennedy has falsely and/or fraudulently obtained at least the following registrations:

| Mark | Reg. No. |
|---|---|
| NATIONAL DIVERSITY COUNCIL | 6915281 |
| NATIONAL DIVERSITY COUNCIL AN INCLUSIVE COMMUNITY A BETTER NATION | 6933084 |
| NATIONAL DIVERSITY AWARDS | 6458087 |

278.    When submitting each trademark application, Kennedy provided specimens that show NDC's use of these trademarks—not Kennedy's.

279.    In each of these registrations, Kennedy alleged a date of first use based on NDC's use of the mark.

280.    Kennedy never identified NDC as the proper owner of these registrations.

281.    Under 15 U.S.C. § 1119, this Court may determine the right to registration, order the cancelation of at least registration nos. 6915281, 6933084, and 6458087, judicially determine that NDC, not Kennedy, is the owner of the registrations for NDC's trademarks, and direct the USPTO to make appropriate entries in the records with respect to these registrations.

282.    Because Kennedy obtained these registrations by false or fraudulent declaration or representations, the Court should cancel these registrations.

283.    In the alternative, the Court should declare pursuant to 15 U.S.C. § 1119 that NDC is the owner of these registrations, and Kennedy is not the owner.

284.    NDC has been injured and damaged as a result of Kennedy's registration of these marks.

285.    NDC is entitled to recover its actual damages and the costs of this action.

<div align="center">

**COUNT II:**
**Damages for Kennedy's False or Fraudulent Registrations**
**Under the Lanham Act, 15 U.S.C. § 1120**

</div>

286.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

287.    Kennedy has falsely and/or fraudulently obtained at least the following registrations:

| Mark | Reg. No. |
|---|---|
| NATIONAL DIVERSITY COUNCIL | 6915281 |
| NATIONAL DIVERSITY COUNCIL AN INCLUSIVE COMMUNITY A BETTER NATION | 6933084 |
| NATIONAL DIVERSITY AWARDS | 6458087 |

288.    When submitting each trademark application, Kennedy provided specimens that show NDC's use of these trademarks—not Kennedy's.

289.    Kennedy never identified NDC as the owner of these registrations.

290.    NDC has been injured and damaged as a result of Kennedy's registration of these marks.

291.    Under 15 U.S.C. § 1120, Kennedy is liable to NDC for any damages sustained in connection with his registration and purported attempt to exercise control over NDC's marks.

292.    NDC is entitled to recover its actual damages and the costs of this action.

## COUNT III:
### Common Law Trademark Infringement, False Designation of Origin, and Unfair Competition against Kennedy, D&L, and CDC Under the Lanham Act, 15 U.S.C. § 1125(a)

293.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

294.    NDC is the owner of the NDC trademarks, including NDC, NATIONAL DIVERSITY COUNCIL, and NATIONAL DIVERSITY COUNCIL AWARDS.

295.    The NDC marks are distinctive marks that are associated with NDC and NDC's business and services.

296.    Kennedy, D&L, and CDC have used, and continue to use, in commerce one or more words, terms, names, symbols, devices, designs and combinations thereof and/or false descriptions of origin that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association with NDC and/or as to the origin, sponsorship, or approval of the services and commercial activities, and thus constitute trademark infringement, false designation of origin, false association/affiliation, and unfair competition with respect to the NDC Marks, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

297.    Defendants' actions described above have at all times relevant to this action been willful and intentional.

298.    As a result of Defendants' actions, NDC has been damaged and will continue to be damaged. NDC is entitled to recover Defendants' profits, its actual damages, and the costs of this action. NDC is further entitled to recover treble damages and attorneys' fees under 15 U.S.C. § 1117, as this is an exceptional case due to Defendants' willful conduct.

## COUNT IV:
## Cybersquatting under 15 U.S.C. § 1125(d) against Kennedy, Lee, D&L, and CDC.

299.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

300.    NDC is the owner of the NDC trademarks, including NDC, NATIONAL DIVERSITY COUNCIL, and NATIONAL DIVERSITY COUNCIL AWARDS.

301.    The NDC marks are distinctive marks that are associated with NDC and NDC's business and services.

302.    Defendants registered, used, and/or trafficked in the Domain Names, which are confusingly similar to the NDC marks.

303. Defendants registered, used, and/or trafficked in the Domain Names with an intent to profit from its confusing similarity to NDC's marks. Among other things, Defendants registered the Domain Names despite knowing that they had no rights in any name or mark that was referenced or reflected in the Domain Names.

304. Defendants intended to divert consumers looking for NDC's services online by exploiting the confusing similarity of the Domain Name and NDC's marks for Defendants' commercial gain.

305. Defendants' actions described above have at all times relevant to this action been willful and intentional.

306. Defendants' conduct are directly and proximately causing substantial, immediate, and irreparable harm and injury to NDC and its goodwill and reputation. Defendants' conduct will continue to damage NDC unless enjoined by this court. Plaintiff has no adequate remedy at law.

307. NDC is entitled to injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1125(d)(1)(C), including, among other injunctive relief, transfer of the Domain Names to NDC.

308. NDC is entitled to recover Defendants' profits, its actual damages, and the costs of this action. NDC is further entitled to recover treble damages and attorneys' fees under 15 U.S.C. § 1117, as this is an exceptional case due to Defendant's willful conduct.

## Count V:
## Breach of Contract Against Kennedy, deGroot, Valenciano, Lee, D&L, and CDC

309. NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

310. deGroot, Valenciano, and Lee signed non-disclosure agreements with NDC requiring each to to protect NDC's confidential information.

311.     deGroot, Valenciano, and Lee breached these non-disclosure agreements by, at a minimum, accessing NDC's systems and confidential information after NDC suspended their access, downloading NDC's confidential information, and/or failing to return NDC's confidential information.

312.     Further, Lee breached the non-disclosure agreement by, at a minimum, permitting Kennedy to access NDC's systems and confidential information after NDC suspended his services and after NDC explicitly instructed Lee to suspend Kennedys' access.

313.     Kennedy, deGroot, Valenciano, and Lee also had signed NDC's credit card agreements, governing how each was to use NDC issued credit cards.

314.     Kennedy, deGroot, Valenciano, and Lee each breached these credit card agreements by, among other things, using NDC's credit cards for purchases of goods and services for non-NDC endeavors, such as non-NDC goods and services.

315.     D&L and CDC had oral or implied contracts with NDC to reimburse NDC for expenses that NDC paid on behalf of D&L and CDC.

316.     NDC has performed all of its obligations under the parties' agreements, and all conditions precedent to Defendants' required performance under the agreements have been performed, will be performed, or have been waived.

317.     Defendants' breaches were material.

318.     As a direct and proximate result of Defendants' conduct, NDC has been damaged in an amount exceeding the minimal jurisdictional limits of this Court, including nominal damages to the extent necessary.

319.     Defendants' conduct was willful and deliberate.

320.    NDC therefore seeks all remedies to which it may be entitled at law or in equity, including recover of its attorneys' fees.

### Count VI:
### Quantum Meruit against all Defendants

321.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

322.    NDC alleges in the alternative to its breach of contract claims that NDC is entitled to recover in quantum meruit if it is determined that either a valid and enforceable contract does not exist, NDC provided money/goods/services/materials that were outside of or over and above those contemplated by the existing contracts, or the existing contracts are void, invalid, or unenforceable.

323.    NDC provided valuable money/goods/services/materials to Defendants.

324.    The money/goods/services/materials that Plaintiff NDC provided to Defendants were intended and undertaken for Defendants, and Defendants benefitted from what each received.

325.    For example, NDC made direct payments to Defendants, paid for Defendants' expenses, and provided valuable goods/services/materials to Defendants.

326.    Examples of the goods/services/materials that NDC provided to Defendants includes, but it not limited to, website hosting, Salesforce access, customer relationship management (CRM) access and data, mailing lists, domain name services, presentation/training materials, staffing, event planning, and accounting.

327.    Defendants accepted the money/goods/services/materials that Plaintiff NDC provided, and Defendants used and enjoyed those goods/services/materials.

328.    Defendants had reasonable notice that Plaintiff NDC expected to be paid/compensated for the goods/services/materials provided, and also expected to be reimbursed for the payment of expenses.

329.    As a result of Defendants' refusal/failure to pay Plaintiff NDC for the reasonable value of the goods/services/materials provided, Plaintiff NDC has been damaged.

330.    NDC therefore seeks all remedies to which it may be entitled at law or in equity, including recovery of its attorneys' fees.

## Count VII:
## Violation of the CFAA Under 18 U.S.C. § 1030 against Kennedy and Lee

331.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

332.    Defendants individually and in active concert with each other, violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) on numerous occasions, by intentionally accessing protected computer systems used for interstate commerce or communication, without authorization or exceeding authorized access, and thereby obtaining information from the protected computer and causing loss to one or more persons during a one-year period aggregating at least $5,000 in value.

333.    NDC's computer systems that Defendants accessed on numerous occasions were used to conduct business nationwide and therefore were "used in or affecting interstate or foreign commerce or communication," and meet the definition of a "protected computer" set forth in 18 U.S.C. § 1030(e)(2)(B).

334.    Defendants' access to NDC's computer systems was suspended by NDC.

335.    Defendants were notified that they were not permitted to access any of NDC's systems.

336.    Despite these instructions, and despite having Kennedy's access suspended, Defendants accessed NDC's computer systems.

337.    Defendants accessed and transferred NDC's protected data for their own use without authorization from NDC. Thus, Defendants "obtained information" by accessing NDC's protected computer systems.

338.    As a direct and proximate result of Defendants' conduct, NDC has been damaged in an amount exceeding the minimal jurisdictional limits of this Court, including nominal damages to the extent necessary.

339.    Defendants' conduct has caused and is causing irreparable injury to NDC and, unless enjoined by this Court, will continue to do so.

## Count VIII:
### Breach of Fiduciary Duties against Kennedy, deGroot, and Valenciano

340.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

341.    By the nature of their positions with NDC, Kennedy, deGroot, and Valenciano each owed NDC fiduciary duties, including a duty of loyalty and utmost good faith, a duty of candor, a duty to refrain from self-dealing, a duty to act with integrity of the strictest kind, a duty of fair and honest dealing, and a duty of full disclosure.

342.    Defendants breached their fiduciary duties.

343.    Defendants' breaches proximately or directly caused damages to NDC.

## Count IX:
**Tortious Interference with Existing Business Relationships or Contracts against Kennedy, deGroot, Valenciano, D&L, and CDC**

344.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

345.    NDC has numerous existing contracts and relationships, for example, in the form of partnership agreements.

346.    Defendants willfully and intentionally interfered with those contracts and relationships contracts, for example, by intentionally stopping the invoicing of partners.

347.    By stopping the invoicing of partners, Defendants intended to terminate NDC's contracts and/or relationships with its partners.

348.    Defendants' conduct was calculated to cause—and did in fact cause NDC injury.

349.    NDC incurred actual damage or loss as a result of Defendants' conduct.

## Count X:
**Tortious Interference with Prospective Business Relationships against Kennedy, deGroot, Valenciano, D&L, and CDC**

350.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

351.    There was a reasonable probability that the NDC would have entered into a business relationship with third parties, such as by renewing or adding new partnership agreements.

352.    Defendants either acted with a conscious desire to prevent these relationships from occurring or knew their interference was certain or substantially certain to occur as a result of their conduct.

353.    Defendants' conduct was independently tortious or unlawful.

354.    Defendants' interference proximately caused NDC's injury.

355.    NDC suffered actual damage or loss as a result.

## Count XI:
## Conversion and Civil Theft by All Defendants

356.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

357.    NDC owned personal property.

358.    Defendants wrongfully acquired and exercised dominion and control over NDC's personal property in the manner specified above.

359.    Defendants' wrongful acts proximately caused injury to NDC, which resulted in damages such as loss of use of the converted property and loss of profits from the converted property.

## Count XII:
## Civil Theft against Defendants

360.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

361.    NDC brings suit under the Texas Theft Liability Act for an unlawful appropriation of property. NDC was entitled to possession of personal property.

362.    Defendants unlawfully appropriated NDC's personal property without the consent of NDC in violation of Texas Penal Code section 31.03 in the manner described above.

363.    Defendants' unlawful appropriation was made with the intent to deprive NDC of the personal property.

364.    Defendants' wrongful conduct cause injury to NDC, which resulted in damages.

365.    Upon proof of actual damages, NDC is entitled to additional statutory damages.

## Count XIII:
## Civil Conspiracy against Defendants

366.    NDC realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

367.    Defendants agreed and/or conspired with each other in connection with aiding and abetting violations of 15 U.S.C. § 1125(d) and 18 U.S.C. § 1030, as well as the remainder of the above-identified counts.

368.    Defendants participated in the conspiracy and performed acts, made statements, and concealed information, all in furtherance of such conspiracy.

369.    Defendants combined to accomplish an unlawful purpose and/or a lawful purpose through unlawful means.

370.    NDC has been injured as a direct and proximate result of the conduct described above.

371.    NDC therefore seeks all remedies to which it may be entitled at law or in equity.

## EXEMPLARY AND PUNITIVE DAMAGES

372.    Defendants have engaged in acts that were intentionally, willful, fraudulent, knowing, wanton, malicious, and grossly negligent and were without justification or excuse. Accordingly, NDC is entitled to recover exemplary or punitive damages. Furthermore, because Defendants' conduct—i.e., theft in excess of $30,000—gives rise to criminal liability under Chapter 31 of the Texas Penal Code, as, at a minimum, a third degree felony, there is no cap on the exemplary damages that NDC may recover. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(13).

## **PRAYER FOR RELIEF**

WHEREFORE, NDC respectfully prays that the Court enter judgment in its favor on each and every claim for relief set forth above and award it relief against Defendant including, but not limited to:

(1) Actual, treble, and uncapped exemplary damages;

(2) In accordance with 15 U.S.C. § 1116, issue a permanent injunction enjoining Defendants and all persons in active concert or participation with Defendants from the acts described in this Complaint;

(3) Order Defendants and all persons in active concert or participation with Defendants to identify all third parties to whom Defendants have represented an ownership, affiliation, association, or sponsorship with the NDC Marks and to whom Defendants have distributed any type of materials incorporating the NDC Marks;

(4) Order Defendants to provide an accounting of all sales, revenues, and profits related to Defendants' goods and/or services that infringe the NDC Marks and that are falsely designated as being sponsored by, approved by, affiliated with, or associated with NDC;

(5) Order Defendants to transfer the NDC Domain Names to NDC.

(6) In accordance with 15 U.S.C. § 1118, order all materials in Defendants' possession or control bearing the NDC Marks be surrendered for destruction;

(7) In accordance with 15 U.S.C. §§ 1117, award NDC all of Defendants' profits from the aforesaid acts of trademark infringement and unfair competition;

(8) In accordance with 15 U.S.C. § 1117(a), find this case to be exceptional in NDC's favor and award NDC its reasonable attorney's fees, costs, and expenses of this action;

(9)     In accordance with 15 U.S.C. § 1119, order the Director of the USPTO to cancel the registration of NDC's trademarks, including registration nos. 6915281, 6933084, and 6458087, or in the alternative, order the Director of the USPTO to identify NDC as the owner of the registrations for NDCs trademarks, including registration nos. 5346028, 6051338, 6915281, 6933084, and 6458087;

(10)    In accordance with 15 U.S.C. § 1120, award NDC all damages sustained as a result Kennedy's fraudulent registration of registrations, including registration nos. 5346028, 6051338, 6915281, 6933084, and 6458087, including NDC's attorneys' fees, costs, and expenses associated with this action;

(11)    Imposition of a constructive trust on proceeds, funds, or property obtained as a result of the breaches of Defendants' fiduciary duties;

(12)    Forfeiture of all back pay that Defendants improperly paid themselves and all back pay they claim is due;

(13)    Disgorgement of all profits, including salary and benefits, made by and through the breaches of Defendants' fiduciary duties;

(14)    Award NDC its costs and pre-judgment and post-judgment interest at the maximum allowable interest rate;

(15)    Order that Defendants must file with the Court and serve on NDC's counsel within 30 days after entry of the injunction, a written report, sworn under oath, setting forth in detail the manner and form in which Defendant has complied with the injunction;

(16)    Order Defendants to refrain from accessing any of NDC's computer systems, including email systems and shared workspaces;

(17)    Order Defendants to transfer NDC's Domain Names to NDC;

(18)    Order Defendants to identify all of NDC's confidential documents and materials that are in Defendants' possession, and to return or destroy all such materials; and

(19)    Grant NDC such other relief, at law or in equity, to which it is justly entitled.

May 9, 2023                                 Respectfully submitted:

**HOLLAND & KNIGHT LLP**

By: */s/ Justin S. Cohen*

**Greg Meece**
   Texas Bar No. 13898350
   S.D. Tex. Bar No. 17487
   Greg.Meece@hklaw.com

   811 Main Street, Suite 2500
   Houston, Texas 77002
   713.821.7000

**Justin S. Cohen**
   Texas Bar No. 24078356
   S.D. Tex. Bar No. 1154835
   Justin.Cohen@hklaw.com

**Dina W. McKenney**
   Texas Bar No. 24092809
   S.D. Tex. Bar No. 3501700
   Dina.McKenney@hklaw.com

   One Arts Plaza
   1722 Routh St., Suite 1500
   Dallas, Texas 75201
   214.969.1700

*Attorneys for National Diversity Council*